IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs February 23, 2017 at Knoxville

**STATE OF TENNESSEE v. ANGELA MONTGOMERY**

**Appeal from the Circuit Court for Rutherford County**
**No. F-69052        Royce Taylor, Judge**

**No. M2016-00459-CCA-R3-CD**

The Defendant, Angela Montgomery, appeals as of right from her convictions for six counts of rape of a child. The Defendant argues (1) that there was insufficient evidence to support her convictions; (2) that the trial court erred in allowing the State to present evidence that the Defendant used corporal punishment to discipline her children; and (3) that the trial court erred in allowing the prosecutor to introduce a witness's prior inconsistent statements. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Gerald L. Melden, District Public Defender; and Sean G. Williams and Jeffrey Burton, Assistant Public Defenders, for the appellant, Angela Montgomery.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Jennings H. Jones, District Attorney General; and Hugh Ammerman and Sarah Davis, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

The Rutherford County Grand Jury indicted the Defendant for six counts of rape of a child, involving the victim, A.W.[1]  See Tenn. Code Ann. § 39-13-522(a) (2003).  A jury trial began on March 10, 2015.

*Jury Trial*

At the outset of the trial, a jury-out hearing was held to determine the admissibility of evidence that the Defendant used corporal punishment as a means to discipline the victim and his three siblings.  The State sought to enter such evidence at trial "to show the effect that it had on [the victim] and his acquiescence with [the Defendant's] actions."  Counsel for the Defendant responded that there was no correlation between corporal punishment, or "acts of discipline involving physical force[,]" and the Defendant's charge of raping her son.

As an offer of proof, the victim testified that between the years of 1999 and 2002, his mother would use "either a switch or a wooden spoon" to spank the victim and his siblings.  He explained that she used such punishment techniques "when [the children] weren't cooperating in whatever [the Defendant] really wanted them to be doing" or when the victim or his siblings "directly defied her."  The victim stated that the Defendant would use a wooden spoon or switch to hit the disobeying child "anywhere from the calf up to the buttock area to the lower back."  He explained that the Defendant "would hit [the children] until she felt that [they] had learned [their] lesson for whatever the infraction" was.  The victim confirmed that the Defendant hit them in such a way as to leave marks on their bodies.

When asked what impact he believed his mother's use of corporal punishment had on his personal behavior, he responded,

> Well, I learned pretty quick that if I didn't do what she said[, then] I was going to get a pretty substantial switching or a spanking with the wooden spoon.  I mean, she quoted over and over again, spare the rod, spoil the child.  And stated that she was a strict parent.  And that was how she brought us up.  And that's what you are supposed to do is to show your children that they do not defy you.

---

[1] It is the policy of this court to protect the identity of minor victims.  Therefore, we will use initials for each minor involved in this case.  In furtherance of this policy, we will also use initials for relatives and family members of the victim.  Furthermore, both the victim and the victim's younger sibling share the initials "A.W."  For purposes of clarity, throughout the remainder of the opinion, we will refer to victim A.W. as "the victim" and the younger sibling as "A.W."

The prosecution asked the victim if he was scared of the Defendant, and he replied, "Yes." The victim also confirmed that "there was no doubt that [the Defendant] ruled that household."

After hearing arguments from the State and the Defendant and observing the offer of proof, the trial court allowed the State to introduce evidence that the Defendant used corporal punishment on the victim and his siblings. The trial court reasoned as follows:

> Well, I think from the standpoint of looking at the proof that was just presented, this matter is relevant probably under 401 simply to show the nature of the relationship between the parent and the child.
>
> I think that's important. If it falls under 404(b), I think it has to be offered to show a complete story of what's going on in the household. And it would be appropriate to allow that in under those circumstances. So I'm going to allow the proof to come in.

The jury returned to the courtroom, and the following testimony was presented. The victim testified that he was born in 1989, and that he turned thirteen years old in 2002. He stated that the Defendant was his biological mother and that he had three younger siblings: M.W., J.W., and A.W. He explained that his parents were divorced in 1996 and that during the period of 1999 to 2002, he lived with the Defendant "every other weekend[,]" and then he would split time between his parents for "any kind of like school holiday."

The victim described the first time that the Defendant "did sexually inappropriate things with [him]." The victim explained that he had brought home a permission slip from school regarding a sexual education class. He stated that when the Defendant saw the permission slip, she said, "[T]his isn't something you need to learn at school, . . . this is something that would be better learned at home with me." The victim testified that he said he thought his father should sign the permission slip, but the Defendant told him "that it didn't matter. That she was still [the victim's] parent. And that she would teach [him] about the sexual education that [the victim] needed to know."

The victim testified that that night, after his three younger siblings had been put to bed, the Defendant "sat [the victim] down on the love seat in the living room" of their home. He said that the Defendant told him "that this [was] something that everybody ends up learning as you . . . grow into an adult" and that she removed her clothing and showed the victim "her vagina and genital area." When asked to describe the incident in further detail, the victim said,

She spread her legs and then began to spread her labia open and started to point out her vagina and what that would be used for in sex and reproduction. And that's where the baby comes from. And, you know, that's kind of where the action is when you are having sex.

. . . .

She asked me if I wanted to touch her. And I stated that I did not. And then she went ahead and took her top off and showed me her breasts and talked about how they were involved in what's called foreplay and . . . during intercourse. And how that they were where the baby breast feeds. And that [was] the role they would play as far as actually having a child and feeding it.

The victim asserted that during this incident, the Defendant did not touch him and that he did not touch the Defendant. The victim stated that at the conclusion of this incident, he told the Defendant that he did not think he was ready for "that much in graphic detail."

Regarding sleeping arrangements in the Defendant's home, the victim testified that M.W. and J.W. shared bunk beds in one room upstairs and that "sometimes [A.W.] would sleep in the bed with [the Defendant] or sometimes [the victim] would sleep in the bed with [the Defendant]." The victim said that when he was not sleeping in the same bed as the Defendant, he slept in the bunk beds with M.W. and J.W. The victim explained that both the bedrooms were on the upstairs level of the Defendant's home.

The victim recalled that the next "sexual contact" with the Defendant occurred the night after the first incident. He detailed the encounter as follows:

When I was coming out of the shower, I was walking into the room that she slept in because I had some drawers there where I kept my t-shirts and underwear and shorts and stuff. Kind of like pajama clothes and a few shirts and everything.

And I had my towel on. And I was getting my pajamas out. And she came into the room and proceeded to tell me that I was going to be starting puberty soon.

And I was starting to put my t-shirt on and was going to – I was like, okay, well, you know, that's, I guess, good information to know. And before I could put my shorts on, she took my towel off and started to handle my genitals and show me that my testicles would get bigger and my penis

-4-

would get bigger. And that I would start to grow pubic hair around that area. And started to stroke my penis to the point that I reached an erection.

The victim said that after he reached an erection, the Defendant told him "that's what you have to do with a penis before it's ready for sex." The victim testified that the Defendant continued "to stroke" his penis, and he told her "that [he] wasn't really comfortable with that." The victim said that the Defendant told him "that's part of growing up . . . . You get comfortable with sexual contact."

The victim stated that the next sexual episode occurred on his "next visitation" with the Defendant, approximately two weeks later. He stated,

> That time I was coming out of the shower. And [the Defendant] pretty much did the same thing but continued stroking me a lot longer on my penis with an erection. And explaining that that's a natural part of sex is the foreplay. And, you know, to get your partner aroused and everything. And, you know, that that's something you get more comfortable with the more you do it.
>
> . . . .
>
> On that incident, I believe I – that was the first time that she actually made me climax, which at the time was completely new to me. I had never experienced that before. The only time that I really was using my genitals was to go to the bathroom. I had never experienced that.
>
> And it felt kind of like an electric sensation shooting through my penis. And it kind of really freaked me out because I didn't know what it was. And she explained that that's a climax. That's what happens. That is the point of sex is to offer your partner pleasure and everything.
>
> And after that happened, you know, my erection went down. And I put my clothes back on and went into the bathroom and tried to look at myself to make sure that, you know, nothing was wrong. Because I didn't know if I had done something wrong and broken myself or something. And I kind of cleaned myself up[.]

The victim stated that another incident with the Defendant did not occur for the next "three or four months." The victim described this encounter, recalling a time where he took his clothes into the bathroom, so that after showering, he could get dressed in the bathroom. The victim explained that he "figured if [he] was already dressed by the time [he] got out of the bathroom, then [he] wouldn't have to go" into the Defendant's

bedroom and "be naked looking for [his] clothes." He said that while he was in the shower, however, the Defendant came into the bathroom and removed his clothes from the room. He explained,

> So, when I came into the bedroom to get some more pajamas or to find the ones that weren't in [the bathroom], [the Defendant] proceeded to start to fondle my genitals again to the point where I got an erection. And said that – at this point, she was going to teach me about oral sex. And started to put my penis in her mouth. And sucked and stroked me to the point of climax.

The victim said that he ejaculated onto the carpet and then went back into the bathroom and cleaned himself. The State elected to use these factual allegations to support count one.

The victim described another episode in which the Defendant "perform[ed] oral sex" on him in the Defendant's bedroom. He said,

> I started to climax again and kind of turned my head and was kind of expecting what was going to happen. And I looked over at – when I opened my eyes, I was looking towards the dresser and saw this C.D. case of Neil Diamond's Greatest Hits. And was kind of trying to pull it together and everything. And went ahead and climaxed. And that was kind of that round for that night.

The prosecutor asked the victim if he remembered what type of clothing the Defendant wore during these sexual encounters, and he said that "she usually just wore like a long t-shirt to bed." The State elected to use these factual allegations to support count two.

The State also asked the victim if he remembered any other times that the Defendant performed oral sex on him. The victim said,

> Yeah. The oral sex kind of became the norm after she did that the first time. And during the course of that, she would take my hand and tell me that this is part of foreplay to get your partner excited for actual intercourse. And would take my hand and put it into her vagina and have me push my fingers in and out to satisfy whatever she was trying to get out of that.

> And sometimes she would just make me do it on my own. And sometimes she would hold my wrist and continue the penetration herself.

-6-

When asked to describe the first incident in which this occurred, the victim responded,

> Well, at that point, [the Defendant] had already performed oral sex on me. And then said that I was ready to learn some more about sex. And had me get up on the bed with her. And she was [lying] back with her t-shirt pulled up with her lower body exposed.
>
> And [the Defendant] took my wrist and started to rub her vagina. And told me that you use these two fingers, the middle two or the index and the middle finger, to put that into the vagina and go back and forth to create friction.
>
> Because [the Defendant] was saying that if you just stick it in, it's kind of boring. It doesn't really do anything. But if you go back and forth, that creates a lot better sensation for your partner.
>
> . . . .
>
> And [the Defendant] had me do that for several minutes until I assumed that she climaxed or at least felt that I had apparently learned enough to know how to do it.

The State elected to use this allegation to support count three.

The victim described another sexual encounter with the Defendant that occurred at a different time than any of the previously discussed incidents. He explained,

> There was a particular [incident] where she – she took – she was holding my penis and kind of put her arm around my side and – sorry.
>
> She was starting to pull my penis into her vagina, and I really started freaking out and saying that I couldn't handle that. I wasn't ready for that. And it was too weird. It's too much. And I freaked out. And she – I guess I made enough of a fuss that she let me stop.

The victim said that this particular encounter upset him a great deal because he "didn't want to lose [his] virginity to his mom." When asked if his penis was inside the Defendant "in any way, shape, or form[,]" the victim said, "[T]he tip of my penis started to press inside her vagina" and "that it went in between her inner labia." The State elected to use this allegation to support count six.

The victim testified that he took strategic measures to avoid sexual encounters with the Defendant. For example, the victim began showering before his other siblings and getting dressed quickly while the Defendant was busy bathing the other children. He said that he would "go to bed in the other room" and "pretend to be asleep" so that "nothing would happen."

The victim testified that he remembered "separate and distinct" incidents where the Defendant "asked [him] to put [his] fingers inside of her vagina." When asked to describe one such occurrence, the victim stated,

> There was a particular night where [the Defendant] had me do it for longer than I usually would. And in the course of doing that, I noticed that there is a part that felt a lot rougher than the rest of the vagina. And as I touched that part, she said that that was a good place to touch it.
>
> . . .
>
> And I just continued to rub it for her. And she seemed to enjoy that more than just the regular in and out motion.

The State elected to use this allegation to support court four.

The victim described another incident involving digital penetration and said,

> [T]here was a particular time where she was having me come on to the bed with her. And after I had got done digitally penetrating her, I thought it was kind of over. And then she proceeded to take my shorts off and perform oral sex on me after that.

When asked if he remembered any other specific incident regarding sex with the Defendant, the victim explained,

> There was a particular time where she was performing oral sex on me that ended up leading to digital penetration. And that particular time, I didn't climax. What had happened, [A.W.] had knocked on the door and asked for a drink of water. And [the Defendant] told [A.W.] that she would be out in a few minutes.
>
> And once A.W. had interrupted us, [the Defendant] stopped performing oral sex on me and got me up on to the bed with her and had me digitally penetrate her until either she climaxed or she had just had her fill

-8-

of it. And then proceeded to leave and take care of [A.W.] after she had sent her back to bed.

The State elected to use this encounter to support count five.

The victim testified that the incidents had occurred from approximately 1999 to 2002. When asked how he was able to "pinpoint these instances" in that specific time frame, he said that the abuse continued on a regular basis when he visited her until the Defendant moved away. Furthermore, he recalled a time close to Easter when his father told him that "every [twelve-]year-old boy should have a duck and learn how to raise chickens." The victim testified that his father took him to Tractor Supply to purchase "some ducks and some chicks" and that "playing around" with these animals "helped take [the victim's] mind off of everything[.]" The victim said that purchasing the ducks occurred after the incident when the Defendant "tried to have penile, vaginal intercourse" with him.

In addition to describing the sexual encounters with his mother, the victim described how the Defendant acted as a mother. He said that "other than the sex abuse and the times" that he "was angry at [the Defendant] for spanking [him], she was a great mom." The victim testified that the Defendant was "a really good cook" and that she "had a good sense of humor." He stated that she taught him and his siblings "good morals" and "tried to make sure that [they] had fun activities to do when she had time with [them]."

The victim also testified in front of the jury that his mother used corporal punishment as a means to discipline the victim and his siblings. The victim explained that the Defendant would "spank" him using "a wooden spoon or a switch" from "time to time." He said that the switch "was a thin piece of wood" that was "kind of like a conductor's baton." When asked to describe "how [the Defendant] ran the house" and her use of "corporal punishment," the victim responded,

> Well, she would say that she's a strict parent. And that if you . . . spare the rod, you spoil the child. And, you know, if we didn't do what she told us to do, you know, we were going to get a spanking for it. You were supposed to obey your elders and your parents and do what they tell you to. And if you don't, then you get spanked for it.

The victim agreed that there was "no question in [his] mind that if [he] disobeyed [the Defendant] in her house, [he] was going to get spanked for it." The victim testified that he feared getting spanked and that he was especially fearful of such disciplinary action "during the times that it was sexual[.]" He said,

I knew that if this [was] what she [wanted] to do [at night], there [was] not really anything I c[ould] do about it without getting spanked and then having to go through it anyway. So, what [was] the point. It would just make things even worse than they already were.

The prosecutor asked the victim if the Defendant ever explained why she forced the victim to engage in sexual activities with her. The victim testified that the Defendant told the victim that if parents "love [their] children" that "they teach them how to have sex . . . so that they know what sex is and how to have an adult relationship." The victim said that he believed the Defendant "at first" and thought "everybody [went] through this." He claimed that it was not "until [the victim] started spending time with other children that that was way out of the norm." The victim said that he discussed the sexual encounters with his stepbrother, who told the victim "that's kind of weird." The victim also told his stepmother about these incidents, and "she got really upset."

The victim explained that after he told his stepmother, the Department of Children's Services (DCS) and other agencies began investigating his claims of sexual abuse. The victim explained that he went to DCS "quite a few times." He explained that in addition to telling his stepbrother and stepmother about the abuse, he disclosed this information to "different counselors[,]" including counselors working for DCS. However, the victim said that he "talked about how [the Defendant] was" touching his penis, but that he "wouldn't go into like the oral sex and the attempt at penetration and everything because [he] was really embarrassed about it." Furthermore, he said that the counselors "didn't seem like they really cared." The victim explained that the visitations continued with the Defendant, despite his meeting with DCS "[s]everal times" and his bringing allegations. The victim said that he "didn't really trust [the counselors] after that" and that he was "not going to open up and tell them all of this really embarrassing stuff when it's not going to help anyway."

The victim stated that P.D. was his "aunt on [his] father's side." He explained that he had "a really great relationship" with P.D. and said that P.D. had been friends with the Defendant for a long time. The victim asserted that he never disclosed anything regarding the sexual abuse to P.D. because he "didn't want her to look at [him] differently." The victim testified that P.D. never directly asked him about the abuse and said that she "would just kind of state like, you know, [the Defendant] probably wouldn't do anything like that." This victim said that he "wouldn't really respond" because he "didn't want [P.D.] to find out." However, the victim believed that P.D. was aware of the allegations he had made against the Defendant. The victim said that he had told multiple people about the abuse, including a guardian ad litem, but that nothing happened. The victim further explained that he did not wish for anyone to find out about the abuse "unless they could do something about it and stop it." The victim said that he "was tired

of telling so many different people about it and being really embarrassed and then just to be let down over and over again and still have to endure it."

The victim testified that he also told his first girlfriend, M.A., about the sexual abuse involving the Defendant. The victim explained that he graduated from high school in 2008. Following graduation, the victim moved to Kansas City, where he met M.A. The Defendant and M.A. began dating in January 2009, and the two dated until approximately eight months prior to this trial. He moved to North Dakota with M.A., and they spent time living and working in Arizona. The victim explained that after dating M.A. for seven months, he began a "physical relationship with her." The victim explained that certain sexual activities with his girlfriend made him uncomfortable, and he "kind of broke down" and explained to his girlfriend that "the first time [he] ever experienced oral sex [was] because [his] mother was doing it to [him]" and that he no longer enjoyed oral sex. The victim said that this conversation took place in late 2009.

The victim testified that he was contacted by the Murfreesboro police regarding an investigation into this case in 2012. The victim returned to Murfreesboro to be interviewed by detectives. The victim stated that due to the investigation, he moved permanently to Murfreesboro. When asked "[b]ut for the phone call from the Murfreesboro detectives saying, hey, we are investigating this and want you to come and interview with us, would you have ever sought to initiate some prosecution of your mother on your own[?]", the victim replied, "No. Because I was just happy that it was over with."

On cross-examination, the victim admitted that he told a DCS counselor that nothing inappropriate ever happened with the Defendant. The victim explained that he told DCS the sexual allegations were false because the Defendant told him that if he told DCS about the abuse that she would go to jail. The victim said, "[The Defendant] was like, if you children keep saying these things, they are going to put me in jail. And I really don't want to go to jail. They do horrible things to people in jail." The victim testified that these comments "freaked all of us out" and that he "didn't want . . . to have anything like that happen to" the Defendant. The victim stated that he "just want[ed] [the Defendant] to stop" and that because "DCS hadn't done anything so far, [the victim] just kind of kept [his] mouth shut."

When asked if the victim ever told his aunt, P.D., that he had fabricated the sexual abuse, the victim said that he did not. The victim stated that he would "kind of skirt the question" and tell his aunt that "everybody says [he was] making it up. So, what's to be done about it." Defense counsel also asked the victim if he recalled having a conversation with his brother M.W. "concerning the allegations [the victim] had brought against [their] mother[.]" The victim said that he and M.W. spoke briefly about the

-11-

allegations after the victim graduated from high school. The victim stated that he and M.W. both expressed relief that the abuse had ended and happiness about being "grown now." The victim denied telling M.W. that he had "made up" the allegations and that "things didn't happen."

On re-direct examination, the victim testified that he told his father, P.V.W., about the sexual abuse allegations against his mother. The victim said that his father did not immediately believe him and told the victim that he should not "be making stuff up about [the victim's] mom like that." The victim explained that his father told him that he was going to "keep fighting for [the victim] and trying to get sole custody of" the victim and his siblings, but the victim did not "have to say stuff like that" about the Defendant. The victim said that his father eventually believed that he was telling the truth about the Defendant.

The Defendant testified on her own behalf. She stated that she married P.V.W. in 1984 and that they lived in Nashville, Tennessee. She explained that she and P.V.W. owned several campground properties together and that the two were "baptized as Jehovah's Witnesses" in 1991. She explained that she and P.V.W. had four children together: the victim, M.W., J.W., and A.W.

The Defendant testified that in December 1995, P.V.W. "confessed that he had had an affair with" a campground manager on one of their properties and that their marriage began "to deteriorate." The Defendant stated that she and P.V.W. began divorce proceedings in May 1996 and that the Defendant took the four children and moved to North Carolina. After a custody hearing in August 1997, P.V.W. was awarded custody of the three boys: the victim, M.W., and J.W. The Defendant testified that P.V.W. "disassociated himself" from the church in 1996, and she believed that she was not awarded custody because she was a Jehovah's Witness.

The Defendant said that she lived in North Carolina until December 1998 and that she moved to Murfreesboro, Tennessee, in January 1999. The Defendant said that she returned to Tennessee so that she "could have more visitation with [her] children." She said that regarding custody, she had the children "every other weekend" and that she and P.V.W. "divided holidays." The Defendant moved back to North Carolina in July 2002 and had custody of the two youngest children, J.W. and A.W., at that time. In the summer of 2003, the victim and M.W. also went to reside with the Defendant in North Carolina and remained there until fall 2003. All of the children returned to Tennessee with P.V.W. in the fall of 2003, and the custody dispute between the Defendant and P.V.W. continued.

In 2005, the Defendant moved to Portland, Oregon "because there [were] allegations of sex abuse" from the victim. The Defendant explained that she fought "these allegations" from 2003 to 2005 and that the process was "very emotional" and "very traumatic"; thus, the Defendant decided to move to Oregon. She denied relocating to "flee[] any sort of prosecution." The Defendant said that in 2012, she learned that there "was a warrant out for [her] arrest for rape of a child" and she "turned [herself] in" because she wanted to cooperate.

On cross-examination, the Defendant denied sexually abusing the victim. She agreed that she attempted to be a good mother and that she loved her children. When asked why she thought the victim had raised these allegations, the Defendant stated that she thought "all of these years [the victim had] been manipulated by [P.V.W.]."

P.D. testified that P.V.W. was her brother and that the victim was her nephew. P.D. said that the Defendant was her former sister-in-law and that she had known the Defendant since approximately 1983. P.D. testified that in either late 2010 or early 2011, the victim called her. She said that during this conversation, the victim revealed to her that "he wished he had never said those things about [the Defendant]" and that what he said "was not true." P.D. claimed that the victim told her that he was afraid of his father and stepmother but that he had never been "afraid to be with [the Defendant]." On cross-examination, P.D. agreed that during her telephone conversation with the victim "nothing about sexual abuse was said specifically[.]"

M.W. testified that the Defendant is his mother. He stated that when he was nineteen years old, he had a conversation with the victim regarding the victim's allegations of sexual abuse. M.W. said that during this conversation, the victim expressed regret about "having to uphold the lies that [P.V.W.] told [the victim] to tell" about the Defendant. However, M.W. agreed that the victim never specifically stated "what he had alleged [the Defendant] had done."

On cross-examination, M.W. confirmed that the Defendant was strict with the children while they were with her. However, M.W. said that home life with the Defendant was pleasant and structured. M.W. testified that he preferred living with the Defendant to living with P.V.W. M.W. admitted that the Defendant "ran a tight ship" and that if the children disobeyed, then the Defendant would "spank" the children using "either her hand or a wooden spoon or maybe a switch." M.W. further admitted that these spankings would leave a red mark "for a little bit" but said that he did not consider the spankings to be severe. M.W. also stated that he "believe[d] [the Defendant] never sexually molested or raped" the victim. M.W. agreed that he "never saw or observed anything in [the Defendant's] behavior that [was] in any way consistent with the charges" that the Defendant faced at trial. He also agreed that he was aware of the victim's

-13-

allegations prior to their telephone conversation and said that "we knew about the allegations[,]" having "testified before."

For impeachment purposes, the State confronted M.W. with previous statements he had made to a therapist regarding the Defendant and allegations of sexual abuse. M.W. claimed that he did not remember making such statements.

In response, the State called Linda Arbaugh-Patin as a rebuttal witness. Ms. Arbaugh-Patin testified that she was a psychotherapist, who had been practicing for approximately thirty years. She said that seeing children had always been "a big part of [her] practice." She testified that she never tried "to influence what types of answers that [her] clients g[ave]" because "that would be against [her] ethics." The prosecutor showed Ms. Arbaugh-Patin a stack of documents, which she identified as "progress notes" regarding therapy sessions with M.W. The first document was labeled July 29, 2005, and the prosecutor asked Ms. Arbaugh-Patin to tell the jury some of the statements M.W. made during this session, and the following colloquy took place:

A. Things said by [M.W.], ["]when I came up through the hall and the door was open, I saw [the Defendant] holding [the victim's] privates, his penis, and playing with it. Working through guilt that I didn't stop it or tell anyone.["]

Q. And that's under a heading first memory, is that right?

A. Correct.

Q. Okay. And second memory.

A. ["]I came down the stairs in the morning. [The Defendant] was sleeping in the living room with [the victim] on a blow up bed. She had a real small shirt on that came down to her belly button. Then all she had on was her underwear. All [the victim] had on was his underwear. They were all hugged up with arms and legs wrapped around each other. I didn't do anything about it. Just walked back up the stairs.["]

. . . .

Q. That's all from that session. Then if we could go to a session from June [2], 2005.

A. Okay. I'm there.

-14-

Q. All right. On the reverse side of that cover sheet – again, would this be a solo session or a group session with [M.W.]?

A. Solo.

Q. All right. And on the second page of the records from that session near the top of the page, there is a highlighted portion. Could you tell the jury what it is that [M.W.] reported to you on that date?

A. ["]When eight or nine years old . . . [the Defendant] tickled my private parts and [the victim's], too.["] And I said, your penis? And [M.W.] said yes.

. . . .

Q. All right. Now, thank you. We'll move on to September 27, 2004.

. . . .

Q. What did [M.W.] say during this session?

A. Okay. This says, [M.W.] talked to [the victim] about his fears that [the victim] would go over to [the Defendant's] side. [The victim] reassured [M.W.] that would not happen. We discussed how most children love their parents no matter how abused they were.

And just because [the victim] talks to [the Defendant] does not mean that he has forgotten what she has done.

A. He said, ["]I felt like ready to give up if [the victim] went back over to [the Defendant's] side. This is what I fear most because I don't want her to get custody of us.["]

. . . .

Q. All right. And tell the jury what [M.W.] reported on August [30], 2004.

A. ["]I don't know whether to be mad or nice to [the Defendant] when I see her. My fear is that if I am nice to her, the [j]udge will think she didn't do it and send us back. Telling [the Defendant] the truth doesn't work. She just denies it. It's very frustrating. So, I quit talking.

-15-

[The Defendant is] like the Terminator. There is no end to her attacks.["]

. . . .

Q. [On] June [29], 2004, what was it that [M.W.] reported to you in that session?

A. ["]I will talk to [the Defendant] on the phone. It's like I have got this fire burning in my stomach. She denies everything . . . . Even if I go into detail, she denies this.["] . . . [M.W.] told [the Defendant], ["S]o my eyes are lying to my brain. I have seen it with my own eyes.["]

. . . .

Q. And on [p]age 3 of that sessions notes, can you tell the jury what else [M.W.] reported to you?

A. How do you feel when [the Defendant] denies things you know to be real. . . . That's what I asked. This is how he responded. ["]You can't even imagine how frustrating it is. Zero to [ten], it doesn't even have a number. It's to infinity.["]

. . . .

["]You know what really makes me angry. [The Defendant] tries to make me feel bad for telling her the truth. Anger, zero to [ten], to infinity.["]

Q. Thank you, [Ms. Arbaugh-Patin]. If we could go to June [8], 2004[.]

A. Okay. [M.W.] said that he told [the Defendant] – and this is in quotes – ["T]his isn't fair because the [j]udge did not hear all of the information, and what you did was wrong. I think you know that. I'm going to talk to my lawyer. I'm never going to see you unless you get serious mental health.["]

Q. Okay. Let's skip ahead to June [1], 2004.

A. ["]When we visited with [the Defendant], the people who were supervising the visit were in another room for a split second. They went and laid their stuff down. We were in front of the people supervising, and [the Defendant] told me, I just want you to know I forgive you for everything that's happening.

-16-

I thought, I didn't do anything.  I felt sort of frustrated and hurt.  She knows she did it . . . .  I felt freaked out for a second like are you crazy.["]

Q.  Thank you.  We'll move on to April [20], 2004.  On page [three] of the attached notes.

. . . .

A.  Okay.  "This is what happened to me and the reason I don't talk about it."  And [M.W.] said, ["]I don't worry about it.  I don't feel the need to talk about it.  I have told myself that . . . why should I let something that happened to [the Defendant], her own sexual abuse issues . . . .  Wreck my whole life.  I decided it does not affect me.["]

Q.  Okay, and this topic was a topic of conversation that you and [M.W.] engaged in regularly, right?

A.  All of these things.

Q.  Okay.  We'll go back to February [9], 2004.  What did [M.W.] report[?]

A.  Okay.  ["]From [age] five to nine, [the Defendant] tickled my penis.  I told [my stepmother] when I was nine years old.  [My stepmother] called [the Defendant] and told her that if [the Defendant] did not stop, she would notify DCS . . .  [and] [a]nyone else that would listen.

[The Defendant] stopped touching my penis, but did not stop touching [the victim] or J.W.  She quit for a while with me.  The [Defendant] started undressing around me when I was 11.  She started this past summer.

. . . .

[The Defendant is] sexually abusing me.  More than I have revealed so far.["]

. . . .

Q.  Okay.  Go to January [7], 2004. . . .  There are several notes about visitations.  If you would read those please.

A.  Okay.  First visitation, [the Defendant] and [the victim] slept together on the couch.  When M.W. asked why, [the Defendant] said because [she] didn't get enough time to mother [the victim] when he was a baby.

Second visitation.  They slept together in [the Defendant's] bed one night, [the Defendant and the victim].

Third visitation.  [The Defendant and the victim] slept together one night in her bed.

Fourth visitation.  [The Defendant and the victim] slept together every night and every night since.

. . . .

A.  [M.W.] said, "I was lucky because [J.W.] cried if I was not in the room with him.  So, I didn't have to sleep with [the Defendant].  It seemed to make [the victim] happy to sleep with her.  Seemed that he enjoyed it.

[The Defendant] used to sleep with [his sister], but now she no longer did.  She just slept with [the victim]."  M.W. said, "I thought it was weird that she quit sleeping with [A.W.] and only slept with [the victim].

If [A.W.] asked to sleep with [the Defendant] if scared of monsters, then [the Defendant] would say no."

. . . .

Q.  Okay . . . .  From February [4], 2004.

A.  All right.  ["The Defendant] is like a wicked witch, but poses for a good fairy.  I saw her tugging on [the victim's] private parts in the pool.["]

Q.  . . .  On February [11], 2004.

. . . .

A.  ["]We were at [the Defendant's] friend's pool alone.  [The Defendant] hugged me like a wife would hug her husband.  Was not a normal . . . [m]om hug.

[The Defendant] pulled off [the victim's] swimsuit.  Then mine, then hers."

-18-

As a rebuttal witness, the State also called M.A. M.A. testified that she knew the victim and that she had dated him "for five years[,]" beginning in 2009. She said that she lived "out west" with the victim and that they worked similar jobs. The prosecutor asked her if the victim had ever told her that he had been sexually abused by the Defendant, and M.A. replied, "Yes." M.A. explained that the disclosure occurred when she attempted to perform oral sex on the victim. She said that the victim "kind of like freaked out. He looked like he was afraid or something." M.A. asked the victim, "[A]re you okay, what's wrong with you[?]" M.A. said that the victim revealed to her "what happened with [the Defendant] and everything." When asked if the victim told her specifically what the Defendant did to him, M.A. replied, "[S]he would do stuff like . . . oral sex."

At the conclusion of the trial, the jury found the Defendant guilty of six counts of rape of a child. Following a sentencing hearing, the Defendant was sentenced to a total effective sentence of forty years' incarceration to be served at one-hundred percent. The trial court denied the Defendant's motion for a new trial, and the Defendant filed a timely appeal with this court.

ANALYSIS

*I. Sufficiency*

On appeal, the Defendant asserts that the evidence was insufficient to support her convictions for six counts of rape of a child. Specifically, the Defendant argues that the "inconsistencies in" the victim's testimony "are so prominent that they create a reasonable doubt that [the Defendant] is guilty" of rape of a child. The State responds that the evidence was sufficient to support the Defendant's convictions. We agree with the State.

An appellate court's standard of review when the Defendant questions the sufficiency of the evidence on appeal is "whether, in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id., State v. Tuggle, 639 S.W.2d 913, 914

-19-

(Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

"Direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference[.]" Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

As relevant here, "[r]ape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by the victim, if such victim is less than thirteen years of age." Tenn. Code Ann. § 39-13-522(a) (2003). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" Tenn. Code Ann. § 39-13-501(7) (2003).

Here, there is sufficient evidence to support the Defendant's convictions for rape of a child. Regarding count one, the victim described an occasion during which the Defendant placed the victim's penis in her mouth and performed oral sex until "just before he ejaculated." Regarding count two, the victim testified that on another occasion, the Defendant performed oral sex on the victim and that during this, he turned his head and noticed "a Neil Diamond Greatest Hits" CD case. Regarding count three, the victim described another encounter with the Defendant during which he placed two fingers inside her vagina and moved his hand "back and forth to create friction." Regarding count four, the victim recalled another time when he digitally penetrated the Defendant's vagina and noticed "a part that felt a lot rougher than the rest of the vagina" and that the Defendant told him that it was a "good place to touch." Regarding count five, the victim said that during yet another encounter, the victim digitally penetrated the Defendant after the victim's younger sister knocked on the bathroom door and requested a drink of water. Regarding count six, the victim testified that the Defendant "pulled [the victim's] penis toward her" so that the "tip of [his] penis started to press inside her vagina[.]" Furthermore, the victim explained that the Defendant told him that parents teach their children "how to have sex . . . so that they know what sex is and how to have an adult relationship." The victim believed this to be true, until he told his stepmother, who "got really upset." The jury found the victim's testimony to be credible and resolved any

-20-

inconsistencies, and we will not re-weigh that finding on appeal. See Bland, 958 S.W.2d at 659. Thus, we hold that the evidence is sufficient to support the Defendant's convictions for six counts of rape of a child. See State v. Bonds, 189 S.W.3d 249, 256 (Tenn. Crim. App. 2005) (noting that "[i]t is well-settled law in Tennessee that the testimony of a victim, by itself, is sufficient to support a conviction") (internal quotation marks omitted).

## II. Corporal Punishment

The Defendant also argues that evidence of corporal punishment by the Defendant was improperly admitted. Specifically, the Defendant argues that such evidence is irrelevant because it "does not tend to prove or disprove any fact of consequence" and "it is not necessary to develop the full story of the offenses [the Defendant] is charged with." The State responds that the Defendant has waived this issue because she failed to include it in her motion for new trial. Furthermore, the State contends that the Defendant is not entitled to plain error relief on this claim. We agree with the State.

In this case, the Defendant failed to raise the issue of corporal punishment in her motion for new trial. Tennessee Rule of Appellate Procedure 3(e) states that "no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for new trial; otherwise such issues will be treated as waived." The Tennessee Supreme Court has explained:

> Before an issue can be properly preserved in a motion for new trial under Rule 3(e), a well-pleaded motion should (1) allege sufficient factual basis for the error setting forth the specific circumstances giving rise to the alleged error; and (2) allege sufficient legal basis for the error by identifying the trial court's claimed legal basis for its actions and some articulation of why the court erred in taking such actions.

Fahey v. Eldridge, 46 S.W.3d 138, 145 (Tenn. 2001). Here, the Defendant failed to include any mention of the issue of corporal punishment in her motion for new trial. Accordingly, the Defendant has waived our consideration of this claim. Moreover, the Defendant makes no argument that this court should review this claim for plain error, and we see no reason to do so sua sponte.

## III. Relevancy of the State's Cross-Examination of M.W.

The Defendant argues that the trial court erred in "allowing the State to cross-examine [M.W.] about statements he had previously made to a therapist about incidents

of sexual abuse" by the Defendant "because the statements are irrelevant[,]"[2] and therefore, Ms. Arbaugh-Patin should not have been allowed to testify. The State responds that the trial court properly admitted M.W.'s "prior inconsistent statements to a therapist to impeach his credibility." We agree with the State.

The general admissibility of evidence is governed by Tennessee Rules of Evidence 401 and 403. Under these rules, the trial court must determine, first, whether the evidence offered is relevant. Tenn. R. Evid. 401. Evidence is deemed relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Although relevant evidence is generally admissible, see Tennessee Rule of Evidence 402, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence[.]" See Tenn. R. Evid. 403; State v. Banks, 564 S.W.2d 947, 950-51 (Tenn. 1978). The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Banks, 564 S.W.2d at 950-51. This court has also stated that "[p]rejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" State v. Collins, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998) (quoting M. Graham, Handbook of Federal Evidence, 182-83 (2d ed. 1986)).

Here, the evidence of M.W.'s prior inconsistent statements to a therapist were used to impeach his credibility. During his testimony, M.W. asserted that the victim lied about the allegations of the Defendant's sexual abuse. M.W. testified that he and his siblings, including the victim, preferred to live with the Defendant rather than live with their father, P.V.B. Furthermore, he denied ever observing any behavior by the Defendant that would make him believe she was capable of committing sexual abuse against the victim or himself. The court held a jury-out hearing in which the trial court determined that the State could use such statements to impeach M.W. Also, the State requested the trial court give an instruction that M.W.'s prior statements could only be considered for impeachment purposes, and the trial court so instructed the jury. When confronted with his prior statements to a therapist, M.W. said that he did not recall making any of those comments, giving the State the opportunity to call the therapist, Ms. Arbaugh-Patin, and introduce prior inconsistent statements that M.W witnessed the

---

[2] The Defendant also argues that admission of these statements violated Tennessee Rule of Evidence 404(b); however, she failed to include this claim in her motion for new trial. Thus, the issue is waived. The Defendant makes no argument that this court should review this ground for plain error, and again, we see no reason to do so sua sponte.

Defendant sexually abuse the victim and that she sexually abused him. <u>See</u> Tenn. R. Evid. 613 (permitting the introduction of extrinsic evidence of a prior inconsistent statement of a witness after the witness has been given the opportunity to explain or deny the situation). Ms. Arbaugh-Patin's testimony was not admitted as substantive evidence but was instead admitted for impeachment purposes. We conclude that M.W.'s prior statements to Ms. Arbaugh-Patin were relevant for impeachment purposes. Moreover, the victim's credibility was an issue at trial, and we conclude that the probative value of M.W.'s prior statements was not substantially outweighed by the danger of unfair prejudice. Thus, the prior statements were properly admitted.

<u>CONCLUSION</u>

Based upon consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____

D. KELLY THOMAS, JR., JUDGE

-23-